GEORGE T. BAKER *vs.* U. S. SAVINGS AND LOAN ASSOCIA-TION.

PROVIDENCE—JULY 24, 1901.

PRESENT : Stiness, C. J., Rogers and Blodgett, JJ.

(1)  *Building and Loan Associations.   Stockholders.*

Where a certificate issued by a building and loan association exactly conforms to the description of one of the classes of stock mentioned in the by-laws of the company and in the statute under which the latter was organized, the certificate purporting to be a certificate of stock upon

———

* This case states no point of law, and is reported merely for reference.

which dividends are to be paid out of the profits of the company, the holder, in accepting the certificate, becomes a member of the corporation and takes the stock subject to the provisions of the statute and of the by-laws so far as they are authorized by it.

(2) *Building and Loan Associations. Right to Withdraw Stock. Statutes.*

Chapter 131 of the laws of Minnesota, 1891, provides that any shareholder in a building and loan association whose shares are not in arrears or pledged shall be entitled to withdraw such shares at any time twenty-four months from the date of the first payment on the shares. Such withdrawing shareholder shall receive all monthly payments made on account of such shares less certain deductions and with certain specified interest, varying with the number of payments made ; provided that if by reason of extraordinary losses the entire net profit is exhausted, the member shall not be entitled to the interest ; and if by reason of extraordinary losses the association is compelled to charge such losses against its capital actually paid in, all withdrawing shares shall be subject to a *pro rata* charge of such losses with those remaining undrawn, and in such case all payment provided shall be considered of no effect and the withdrawing member shall only be entitled to such sums as may be found to be due him after the adjustment of such losses among all shareholders.

Plaintiff, the holder of fourteen shares of the stock of defendant company, notified defendant of his intention to withdraw the same, and defendant accepted said notice, but claimed the right given by statute to charge a proportional part (amounting to ten per cent.) of extraordinary losses in excess of its reserve fund and profits earned to the stock of the plaintiff. The evidence showed that there had been an actual depreciation in the defendant's assets which was greater than the sum of the reserve fund and the net profits which had not been paid out or credited upon the books to the several classes of stock, but which was not greater than the sum of the reserve fund and the profits which had been earned and credited on the books to the unmatured stock :—

*Held,* that, so long as the assets of the defendant equalled the amount paid in on its stock, the statute required it to pay a withdrawing stockholder at least the amount paid in by him (less only stipulated charges), and that not until the assets of the company were reduced by losses below the amount of moneys paid in could it charge such losses *pro rata* against all its stock listed for withdrawal and standing on its books—in the case of withdrawing stock, first cancelling all payments provided for in section 27 of said act.

DEBT. The facts are stated at length in the opinion. Heard on petition of defendant for new trial, and petition denied.

PER CURIAM. The defendant's petition for a new trial is denied, and judgment will be entered upon the decision of

Mr. Justice Douglas for the reason assigned by him in said decision, which is adopted as the opinion of the court.

## DECISION.

DOUGLAS, J.    This is an action of debt brought to recover the face value of certain stock certificates held by the plaintiff, which were issued by the defendant as a building and loan association established under chapter 131 of the laws of Minnesota for the year 1891, and doing business under said chapter and the amendments thereto.    The certificates held by the plaintiff were of Class E of the following tenor (omitting formal parts, dates, and numbers):

"This certifies that ——— has subscribed for and is the owner and holder of ——— shares of the stock of the United States Savings and Loan Company of St. Paul, Minnesota, of the par value of one hundred dollars per share, for which he has paid the full value thereof.

"Upon surrender hereof, the United States Savings and Loan Company aforesaid for value received, hereby promises to pay to the order of said ——— ——— dollars (being the full par value thereof) on the ——— day of ———, with an annual dividend thereon of seven per centum until paid, said dividends to be paid semi-annually on the 15th day of ——— and ——— in each year out of the profits of said Company, at the Office of the Minnesota Loan & Trust Company in the City of Minneapolis, Minnesota, on presentation and surrender of the proper dividend coupons hereto attached.

"In consideration of the aforesaid stipulated dividend and principal the said holder and his assigns hereby waive and surrender all right to participation in any further dividend or savings of said company or to withdraw said stock, or any part thereof prior to the above designated time of payment, except as hereinafter provided.

"Provided, that the holder of this stock may, if he so elect, withdraw the same at any time after three years from the date hereof at the maturity of any dividend coupon, on giving sixty days notice in writing for a sum which shall be equal

to the face value of this certificate, with all due and unpaid coupons thereon from its date.

"Provided further, that if default shall be made in the payment of any of said dividend coupons, and such default continue for sixty days, then at the election of the legal holder thereof, said stock shall at once become due and subject to withdrawal."

The parts of the statute bearing upon the case are as follows: Chapter 131, General Laws of Minnesota, 1891. Relating to Building, Loan, and Savings Associations and general business.

### "STOCK, CLASSES OF.

* "SEC. 26. Every such association heretofore organized under the laws of this state, or incorporated under this act shall not issue preferred stock, but may issue different series of stock, and all shares of stock hereinafter issued shall be of the par value when mature of one hundred dollars ($100) each. Any such association may issue installment stock to be paid in periodical sums, and prepaid stock upon which a gross sum shall be paid in advance, and which installment and prepaid stock shall mature when the amount so paid, together with the dividends declared upon the same, shall equal the par value of such stock (and a dividend bearing prepaid stock upon which a larger sum is paid than on the prepaid stock, and upon which a partial dividend may be paid annually out of the full dividend apportioned thereto,) and may also issue full paid stock upon which the par value thereof shall be paid in advance, in the certificate of which stock the right of withdrawal may be waived for a definite time, and upon which full paid stock a full dividend or a definite dividend may be paid, which dividend shall in no case exceed the per cent. of profits earned by all classes or series of stock at the time said dividend is declared. . . .

---

* Sections 26 and 27 here quoted are nearly identical with Gen. Laws R. I. cap. 188, §§ 7 and 8.

## "STOCK, WITHDRAWAL OF.

"SEC. 27.   Any shareholder whose share òr shares are not in arrears or pledged upon a loan, shall be entitled to withdraw such share or shares at any time twenty-four (24) months from and after the date of the first payment on such share or shares, and not before such date ; provided that the board of directors may, if they deem it to the interest of the association, buy in the share or shares of any shareholder desiring to withdraw at a previous date, paying therefor the sum paid in on said shares, less such discount as may be agreed upon and which shall not in any case exceed eight (8) per cent.   Any such shareholder may give notice of withdrawal in writing to the secretary of said association and the liability of said shareholder to pay further installments and right to share in future profits shall cease with such notice.   Such withdrawing shareholder shall be entitled to receive, at the end of two years from the date of his first payment, all monthly payments made on account of such share or shares (not including admission fees or fines) less the following deductions :

"Fifty (50) cents on each certificate in payment for issuing and cancelling the same, and two (2) per cent. of the amount so paid in for a contingent or reserve fund to be used by the association to meet any contingency or loss in its business, from the depreciation of its securities or otherwise.   (Provided that if the share or shares on which such notice of withdrawal is given are in arrears, a fine of ten (10) cents per share for each thirty days such share or shares are delinquent may be deducted, in addition to the withdrawal fee and charge for the reserve fund hereinbefore provided for).   All stockholders who do not give the notice as hereinbefore provided, failing to make payments, shall be subject to a fine of ten (10) cents per share per month for each month such payments are in arrears, for a period of six months after the last payment made (such fines in the aggregate not to exceed the sum of sixty (60) cents per share), and at the end of such period of six (6) months, if arrearages and fines remain un-

paid, the balance of such monthly payments, if any, after deducting the certificate fee, contingent fund and fines as herein provided, shall be subject to withdrawal at a period not less than twenty-four (24) months from the date of the first payment, on application of the stockholder. If such delinquent shares are not reclaimed or called for within twenty-four (24) months from the date of the last payment, the balance, if any, to the credit of such delinquent shares, shall be transferred to the contingent fund herein provided for, and the delinquent shareholder shall from time to time of such transfer, have no further claim upon the association on account of such share or shares, or the payments made thereon; provided that such shares, which may have been pledged as collateral for the payment of a loan and become delinquent, shall be adjusted as provided for in section four (4) of this act. If such withdrawing member has made twenty-four (24) or more payments and less than thirty-six (36) payments he shall receive the amounts paid less the deductions provided for, and interest on such amount at the rate of five (5) per cent. per annum, for the actual time the association has had the payments in excess of twenty-four (24) months; and if such withdrawing member has made thirty-six (36) or more payments and less than forty-eight (48) payments he shall receive the amount paid in, less the deduction provided for, and interest on such amount at the rate of six (6) per cent. per annum for the actual time the association has had the payments in excess of twenty-four (24) months; and if such withdrawing member has made forty-eight payments and less than sixty (60) payments he shall receive the amount paid in, less the deductions provided for, and interest on said amount at the rate of seven (7) per cent. per annum for the actual time the association has had the payments in excess of twenty-four (24) months; and if such withdrawing member has made sixty (60) or more payments, and the stock has not reached a maturity value, he shall receive the amounts paid in, less the deductions provided for, and interest on such amount at the rate of eight (8) per cent. per annum for the actual time the association

has had the payments : provided that the net profits of the
association for the time the association has had the use of all
of its funds, shall amount to the sum of five (5), six (6), seven
(7) and eight (8) per cent. per annum, computed on the
amounts paid in on all the shares in force at the time such
withdrawals are made, and if such profits are not sufficient
when so computed, then the stock so withdrawn shall be
entitled to a rate per cent. found to be earned as net profits,
during said period, such interest payments to be in all cases
in lieu of such profits.   Provided, further, that if by reason
of extraordinary losses that entire net profit is exhausted,
the withdrawing member shall not be entitled to the interest
herein named ; and if by reason of extraordinary losses the
association is compelled to charge such losses against its cap-
ital actually paid in, all withdrawing shares shall be subject
to a *pro rata* charge of such losses with those remaining
undrawn, and in such case all payment herein provided shall
be considered of no effect, and the withdrawing member
shall only be entitled to such sums as may be found to be
due him after the adjustment of such losses among all share-
holders.   And provided, further, that whenever the capital
of an association has been impaired by losses in excess of its
reserve fund and profits earned, it shall be the duty of the
directors to suspend sales of all classes of stock until such
losses have been adjusted and distributed *pro rata* as a charge
upon the shares of stock in force."   .   .   .

Under the provisions of this statute the company issued
five classes of stock, of which classes A and B were install-
ment stock, class E was fully paid stock, and classes F and G
were partially prepaid stock.   All the classes except class E
were credited upon the books from time to time with the
amounts paid in and with certain shares of the profits, and
when in any case these payments and profits equalled one
hundred dollars, the stock matured and became entitled to be
retired.   The right of withdrawing after three years was
given to class E, and the right of withdrawal after two years
was given to the other classes.

The obligations imposed upon the company to its stock-

holders by the by-laws and terms of its stock certificates were in part absolute and in part conditional upon the earning of profits.

The absolute promises are :

1. To pay all matured stock in full.

2. To pay all withdrawing stockholders the amounts they have paid in.

These absolute promises are only modified by provisions for fines and contributions to expenses, which may be ignored in this argument.

The contingent promises are :

3. To credit on the books to all stockholders every six months certain specified shares of the profits, if profits are earned.

4. To pay to stockholders of classes E and F every six months certain dividends *if* the profits earned on the whole business amount to the same rate on all the stock outstanding.

5. To pay to stockholders withdrawing before the maturity of their stock certain interest on the amounts paid in *if* profits have been earned by the company for the period during which the withdrawing stock has been in force, at the same rate on all the stock outstanding.

The plaintiff, on the 20th day of October, 1898, being the holder of certificates of class E of the foregoing tenor, dated January 15, 1895, amounting in all to fourteen shares, notified the defendant of his intention to withdraw the same, at the maturity of the next dividend coupon, January 15, 1899, and the defendant accepted said notice.

On December 19, 1899, the defendant notified the plaintiff that it was then ready to pay the amount which it admitted to be due on said stock, to wit, the sum of $1,250.55.

The delay in payment was caused by a regulation of the company under the statute providing that no more than one-half the receipts from sales of stock in any month shall be devoted to the payment for withdrawals unless by voluntary action of the directors.    I do not understand that any question is made of this necessity for delay.

The reduction in amount was made by deducting from the face value of the stock, first, a tax imposed by the State of Rhode Island, and paid by the company, of $10.50, about which, I understand, there is no question; and, secondly, a reduction of $140, which the plaintiff contests, and whence arises the only question in the case.

The defendant claims that in November, 1899, it was ascertained that its capital had been impaired by extraordinary losses in excess of its reserve fund, and profits earned in the sum of $103,731.31, and that, acting under the right given by the statute in such case, it charged a proportional part of such loss to this stock; which is the reduction of ten per cent. in question.

The testimony shows that there had been an actual depreciation in the assets of the company, which was ascertained in November, 1899, and it appears that this depreciation or loss was greater in amount than the sum of the reserve fund and the net profits of the business, which had not theretofore been paid out or credited upon the books to the several classes of stock, but which was not greater in amount than the sum of the reserve fund and the profits which had been earned and credited on the books to the unmatured stock. The defendant contends that this condition of affairs warranted the reduction or assessment, and the plaintiff contends that it did not.

The plaintiff urges, first, that the certificates he held constituted a promise to pay at all events a certain sum as capital and other certain sums as interest, and did not make him a stockholder so as to subject his contract to the conditions or limitations imposed by the by-laws of the corporation or the statute under which the company acted; and, secondly, that by the terms of the statute in question the assessment or reduction was unwarranted, because the profits which had been credited but not actually paid out, being still in the hands and control of the company, were not exhausted, as they should have been before any charge could be made against the capital actually paid in.

(1)  I think the first proposition cannot be sustained. The cer-

tificate exactly conforms to the description of one of the classes of stock mentioned in the by-laws of the company and in the statute. It purports to be a certificate of stock, and the dividends are to be paid out of the profits of the company.

Wherever such certificates have been construed by the courts, they have been held to constitute their holders members of the association. *Towle* v. *Amer. B. & L. Assn.*, 75 Fed. Rep. 938; *Teller* v. *Wilcoxen*, 81 N. W. R. 772 (Ia.); *Latimer* v. *Equitable L. & I. Co.*, 81 Fed. Rep. 776.

The plaintiff, therefore, in accepting these certificates, became a member of the corporation and took his stock subject to the provisions of the statute and of the by-laws, so far as they were authorized by it.

(2)    The second claim involves the construction of the statute itself; and here it must be remembered that we are not dealing with an insolvent corporation, where the courts seek to distribute the assets and arrange obligations of a corporation and its stockholders upon some equitable plan, when it is impossible to provide for the performance of its engagements according to the letter. Here the company is not being wound up in insolvency, but is transacting business, paying old obligations and incurring new ones, and still assuming to be bound by the exact terms of the statute under which it is organized. Our inquiry, therefore, is divested of any merely equitable considerations except as they may bear upon the construction of the language of the statute. If the event had taken place which the statute makes a condition precedent to the imposition of this reduction, it was legal; if it had not occurred, then it was invalid.

The words of Lord Bramwell in *Auld* v. *Glasgow, etc., Society*, L. R. 12 App. Cas. 197, quoted with approval by Judge Bissell in *Hawley* v. *North Side B. & L. Assn.* (Colo.), 52 Pacific R. 411, are applicable here. He says: "It seems to me so utterly wrong, when people have entered into a defined bargain, that it should be set aside upon some more or less fanciful notion of equity or right, that I will not discuss it. I will say 'Hold to your bargain.' I suppose the proverb is

as true in Scotland as it is in England, and true universally, that a bargain is a bargain, as the Lord Chancellor has said, and should be observed."

The provisions of the statute relied upon by the defendant are contained in the last two paragraphs quoted above from section 27. This section is mainly, if not wholly, applicable to the other classes of stock than class E. It provides, first, for withdrawals after twenty-four months from the date of the first payment on the share, and for fines, if notice is given, on shares that are delinquent; then for fines on delinquent stockholders who do not give notice of withdrawal; then for a sliding scale of payments on withdrawal, based upon the number of payments made, specifying in all cases "the amounts paid in," and adding interest at five, six, seven, or eight per cent. per annum accordingly. Then follow provisions for reducing these payments in certain cases. 1st. If the net profits on all the funds of the company for the time it has had the use of the stockholders' funds are found not to have been so large as the rates allowed by this section, these rates are to be reduced accordingly. 2nd. When the entire net profit of the corporation is gone, the stockholders referred to in this section shall not receive the interest which it gives them; and, 3rd, if the losses are so great as to sink the entire profits and the reserve fund, and to diminish the capital actually paid in, these shares, *i. e.,* the withdrawing unmatured stock, shall not receive the amounts paid in, but such amounts shall be reduced *pro rata* with all the shares in the company. Throughout this section there is not one direct provision that relates to any but unmatured stock, and none which by implication extend to fully paid stock except this provision for the contingency of the losses being so great that they must be charged against "capital actually paid in," and the last clause quoted, which authorizes a *pro rata* charge upon all classes of stock when the capital has been impaired by losses in excess of its "reserve fund and profits earned." The contingency in both classes is the same. "Capital actually paid in" is contrasted with "reserve fund and profits earned."

Now, it is evident that the reduction of the assets of the corporation below the amount of its capital actually paid in would render it practically insolvent, so far as its absolute promises to its stockholders are concerned, the only insolvency possible in such a corporation being inability to pay its stockholders dollar for dollar their original contributions. A fair construction of these clauses, therefore, may treat what is in form implied only as a direct rule for dealing with all classes of stock, including class E, when the company is unable to fulfill its absolute agreements; and such, we may conclude, was the intention of the legislature.

But this third contingency only can be construed to affect the class E stock. This is consistent with the whole scheme of the corporation. Class E stock is issued upon payment of the face value thereof, dividends are fixed at the rate of seven per cent., and any reductions, if the net profits of the company should be less than seven per cent., must of necessity be made every six months before the semi-annual dividend is paid and gone from the control of the company. The amount paid in was a definite sum, and no fines or payments on withdrawal based upon anything less than the par value could be possible. Stock of classes A, B, F, and G were not entitled, previous to withdrawal, to receive full dividends, but in some cases left the whole and in others a part of their credited profits subject to the provisions of this section. If the business was prosperous during the whole period that one of these classes of stock remained outstanding, the holder had credited to him much larger dividends and the amounts paid in; but he assumed the chance of having a retrospect taken of the whole business of the company when he should apply to withdraw, which might diminish his credited profits or wipe them out, or impair the amount even which he had actually paid in. The profits, then, which were credited contingently to classes A, B, F, and G, in contrast to the profits on class E and part profits on class F, which were paid out every six months, were at the risk of the business, and these contingent profits are made subject by this section to diminu-

tion or loss before any inroad is authorized upon the "capital actually paid in."

The only sources of income to the corporation were the sale of its stock, the collection of fines and fees, the collection of interest on loans, either in specie or by foreclosure of mortgages and sale of the property thus acquired, and the rise in the value of its securities. It is obvious that whatever assets the corporation had at any time (after the payment of running expenses and debts) over the amounts paid in for stock were "profits earned." The book value of the stock of classes A, B, F, and G was made up of actual payments by subscribers to the stock and profits credited to them as dividends. If the corporation were asked the amount of its capital at any time it might properly enough give the sum of the value of all its classes of stock as carried on its books; but this section does not draw the line between capital stock and unappropriated profits, but between capital actually paid in and entire net profit. If the latter is found to be impaired, then so much of it as has been credited to unmatured withdrawing stockholders is proportionally scaled down. If it is found that no net profit has really been earned, all contingent credits of such supposed profits to any withdrawing stockholders are to be cancelled; but only after this has become necessary can a general and universal assessment or *pro rata* charge against all classes of stock be made.

The effect of this seems at first sight to be that the assessment when it comes must be made not on the book value of the stock, but upon the book value as it is after all the credits of interest, which would have been payable if the profits had actually warranted it, have been deducted; that is, upon the paid in value of the stock, for when this assessment comes to be made it is provided that "in such case all payments herein provided shall be considered of no effect."

It must be borne in mind, however, that the direct provisions of this section apply, as we have seen, only to the case of a stockholder withdrawing before the maturity of his stock. If the losses suffered at the time he withdraws make it necessary to charge against the capital he has paid

in a certain percentage, the same percentage is to be charged against all the stock outstanding, and he is not concerned in the question whether this is reckoned as to the remaining stock on amounts paid in or book values. There is no liability on the part of the company to pay book values until the stock matures, and the remaining stock, except class E, can never mature until new profits shall have made good the losses. A person who withdraws stock not matured after a long period of loss may get less than he puts in; one who remains longer may have these losses made up by subsequent gains.

There is no harm, therefore, in making such an assessment as the statute requires on all the remaining stock estimated at its value on the books. So much of such value, it is true, as consists of dividends contingently credited, is fictitious, but if the holder desires to withdraw, these fictitious credits are at once sunk by this section; and if he prefers to stay, his stock will not mature and become a claim upon the assets of the corporation till subsequent profits have made these supposed values real.

My conclusion is, therefore, that so long as the assets of the company equal the amounts paid in on its stock, the statute requires it to pay a withdrawing stockholder, of any class, at least the amount he has paid in (less only stipulated charges). That when the assets of the corporation are reduced by losses below the amount of moneys paid in, and not till then, it may charge such losses *pro rata* against all the stock listed for withdrawal and standing on its books, in the case of withdrawing stock, first cancelling all payments provided for in section 27. Such an arrangement is not inequitable to any class of stockholders. Those who have agreed to take smaller dividends, provided they should have them every six months, have received such portion of the stipulated payments as the profits for each six months have warranted. Those who, in consideration of a chance to receive larger profits, have agreed that their dividends should be ultimately fixed by the rate earned by the association for the whole period that they remain stockholders, cannot complain if the

business for the longer period turns out to have been less profitable or results in a loss.

Both classes in any event are entitled to withdraw the amounts they paid in, or, if the losses have been so great that this fund is impaired, to be assessed or withdrawn *pro rata* upon their actual contributions to the capital.

It may be said that the method adopted by the company in this case, of making a general *pro rata* reduction of the book value of all the stock when it was found that the assets of the corporation were worth less than the amount of its absolute and contingent liabilities, enables the company to continue its business without interruption, and puts its affairs upon a sounder basis. The answer to this is, the legislature did not see fit to give the company such right; there is nothing in the contracts which it has made with its stockholders in their certificates, nor in its by-laws, subject to which these certificates were issued, to give it such a right, and so it cannot plead its arbitrary action in defence to the plain language of the bargains it has made.

I have carefully examined all the cases cited by counsel, and find no assistance from them in determining the meaning of the statute in question. They are instructive generally upon the equitable principles to be applied in winding up corporations more or less closely resembling the defendant in circumstances not provided for by special statute.

The plaintiff is entitled to recover the face value of his stock, less the State tax, with interest from the 25th day of January, 1900.

Decision for the plaintiff for $——— and costs.

*Tillinghast & Tillinghast*, for plaintiff.

*Dexter B. Potter*, for defendant.